## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| SARAH J. OLDRIDGE | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No.: 6:18-cv-1243-JWB-JPO |
| | ) | |
| CITY OF WICHITA, KANSAS, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## PLAINTIFF SARAH OLDRIDGE'S BRIEF IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

<u>INTRODUCTION</u>

This is a Title VII gender discrimination and retaliation case. Plaintiff Sarah Oldridge was the only female out of 30 Lieutenants with the Wichita Police Department when she participated in the promotion process to become a Captain. As a part of that process, the Chief of Police, Gordan Ramsay, sent the entire department an email about the Captain opening and soliciting responses to an anonymous Survey Monkey poll about the applicants. Oldridge emailed City HR with a number of questions about how the Survey Monkey would be used, including "How will this survey filter out personal or other bias from respondents?" Chief Ramsay emailed Oldridge's immediate boss, Capt. Clay Germany, with responses to only a few of the questions and asked Germany to meet with Oldridge about them. Her bias question remained unanswered.

Disappointed that most of her questions were unanswered, Oldridge emailed the Chief, copying his leadership staff, the other Lieutenants, the City Attorney and a private attorney, reiterating her questions. By this point, the promotions had been announced, and Oldridge was aware that one of the men promoted could not have applied without providing a false answer on his application about his time as a Lieutenant. Thus, Oldridge raised questions about that as well

1

in her email. Oldridge included all Lieutenants on this email because she knew at least one Lieutenant had not applied because of those qualification questions, and she felt if exceptions were available then all Lieutenants should understand this availability. The City's official position in this case is that the questions raised by Oldridge in this email were reasonable to ask and deserved to be answered (even though many never were answered prior to this lawsuit). Her only sin, according to the City, was copying other Lieutenants, the City Attorney and a private attorney.

Oldridge did not receive any response to her email from the Chief. The City has admitted Oldridge's May email is factually correct in that: (1) the application required a present tense statement the applicant had at least one year as a Lieutenant; and (2) the man who was promoted did not have one year as a Lieutenant at the time he applied. Implicit, then, is that the male applicant stated he had one year as a Lieutenant when he applied even though that was not true.

Not only did Oldridge not receive a response to her email, but she was investigated by the Professional Standards Bureau for "conduct unbecoming" an officer.  The PSB investigator interviewed 47 officers, including nearly all of her peers and most of the leadership above her. The PSB prepared a 191 page, single spaced, report.  Oldridge was "sustained" and suspended for one day.  The City has raised as a comparable employee a man who sent an email critical of the Chief to some Sheriff Deputies and was subject to a PSB investigation.  But that was different -- only he was interviewed, not any of his peers, PSB generated a mere 10-page report, and although originally he was suspended the discipline was reduced to a written reprimand.

The PSB investigation was in retaliation for Oldridge continuing to insist on answers to her questions about whether bias was being filtered from the Survey Monkey results and whether one of the men promoted instead of her met the minimum duration as a Lieutenant.  Although the City

argues that Oldridge failed to engage in any protected activity, there is evidence that department leadership interpreted Oldridge to be raising discrimination concerns.

The City also argues that Oldridge suffered no "adverse employment action." For a retaliation claim, however, the standard for adverse action is relatively low. The question is whether the employer did anything that would deter a reasonable employee in the same position from engaging in the protected activity. Obviously, the threat of being subjected to a PSB investigation in which 47 of her peers are interviewed and then a report of 191 pages is written, is the sort of thing that would deter an officer.

Before turning to a paragraph-by-paragraph response to the facts stated by defendant, plaintiff submits the facts and evidence upon which her case rests.

## PLAINTIFF'S STATEMENT OF ADDITIONAL FACTS

1. Captain Germany was Oldridge's immediate supervisor at all pertinent times.  At his deposition, Captain Germany admitted that "Sarah does a great job. Gets rave reviews from community."  (Ex.50, at COW1745).

2. In 2018, the WPD had approximately 30 Lieutenants. Sarah Oldridge was ***the only female Lieutenant*** at that time. (Ex.29, p. 58.)

3. Chief of Police Gordan Ramsay circulated an email to the entire department about the Captain opening and soliciting responses to an anonymous Survey Monkey poll about the applicants. Oldridge emailed City HR with eight bullet point questions about how the Survey Monkey would be used, including "How will this survey filter out personal or other bias from respondents?" (Ex. 30, Oldridge email dated March 12, 2018).

4. The City's HR office's email in response stated "Thank you for your inquiry. However, since the information was sent from your Chief, we feel it is best appropriate for you to refer your

below questions or concerns back to him." (Ex. 31, at PL0098). Oldridge did as advised, forwarding the email chain to Chief Ramsay on March 19, 2018. *Id.*

5.   On April 5, 2018, the Chief emailed Captain Germany with a response and asked him to meet with Oldridge. (Ex. 32, at COW 01514).  Deputy Chief Chet Pinkston had prepared the proposed response, which the Chief adopted and forwarded to Germany. *Id.* Pinkston believed Oldridge's March email implied that she thought the promotion process was not genuine or was rigged – as he put it, she thought "the fix was in." (City Ex. 20, at COW 00028).

6.   Captain Germany testified that when he met with Oldridge to provide the Chief's response to her email, he did not make up any content, he relied on what the Chief provided.  (Ex. 28; p. 81). Germany admitted at his deposition that only 3 of Oldridge's 8 questions were answered.  (Id. 79-85).  Regarding the question about filtering out bias, Captain Germany testified as follows:

> Q.   The third one is, "How does this survey filter personal or other bias from the respondents?"  Is that responded to?
> A.   Not directly.
> Q.   Is it responded to even indirectly?
> A.   When we're looking at these bullets, I'm summarizing what I was given.  I was not given these bullets to sort out each answer to Lieutenant Oldridge. So, if you are asking me if that answer is in this question, I would have to look through each one and try to gather that information for her.
> Q.   Well, is it fair to say that the e-mail that has the summary of what to say nowhere talks about bias, that word just isn't in there? Would you agree with that?
> A.   I would agree with that.  (*Id.* 80-81)

7.   The job posting for the open Captain position included the following about required experience: "six years of experience as a commissioned Wichita police officer including two years of supervisory experience with at least one year as a Lieutenant with the Wichita Police Department." (Ex 33, at PL0128-129).

8.  To apply for the Captain opening, applicants completed an application on the City's Neogov portal. (Ex.34, p. 8-9) Oldridge completed her application on March 5, 2018. (Ex. 33, at PL0130-133). Oldridge produced a copy of the application during discovery, which she printed from the portal back in 2018. (Ex. 35, pp. 302-305). The application on the portal required applicants to certify that they met the posted requirements for the job, including: "The following verifies my Wichita Police Department experience:" to which Oldridge checked one of the options, which was "at least 1 year as a Lieutenant". *Id.*

9.  One of the men who was ultimately promoted is named Wendell Nicholson. He completed his Neogov application on February 22, 2018. (City Ex. 16) He admitted at his deposition that at the time he applied, he did not meet the minimum one year of experience as a Lieutenant.  (Ex. 29, pp. 47-48).

10. In 2019, HR modified the certification answers on the Neogov application for Captain so that one could choose to include a certification that the applicant has "at least 1 year as a Lieutenant by time of promotion."  (Ex. 34, p. 25-29) (emphasis added).

11. In the discovery process, the City produced documents purporting to be the applications by Nicholson and Oldridge. (City Exhibits 16 and 17 respectively).  The applications produced by the City reflect that Nicholson and Oldridge answered the same way: that the applicant had "at least 1 year as a Lieutenant by time of promotion." (*Id.*) The qualifying phrase "by the time of promotion" is present in these printouts only because of the 2019 change in the Neogov system and was not included in the answers selected by the applicants in 2018.  (Ex. 34, p. 25-30).

12.  Comparing City Exhibits 16 and 17, with Pl. Ex. 33, leads to the conclusion that Nicholson falsely certified in his application that he met the requirement of one year as a Captain at the time he completed his application.  Nicholson admitted at his deposition that he did not have

the one year of experience when he applied.  He further admitted that he did not talk with anyone in the department, giving him permission to certify that he had a year as a Lieutenant even though he did not. (Ex. 29, p. 48).

13.  When Oldridge learned that Nicholson was promoted to Captain, she was surprised because she knew he had not met the one-year as a Lieutenant requirement by the time the applications closed.  Oldridge emailed the Chief, his leadership staff, the other Lieutenants, and others reiterating her prior Survey Monkey questions, which had only been partially answered, and further inquiring how a person who had not been a Lieutenant for one year could have completed the application and been promoted.  (City Ex. 9.) Oldridge included all Lieutenants on this email because "they are stakeholders" and she felt all of them should understand how the application process is supposed to work.  (Ex.35, Oldridge Depo., p. 278-280).

14.  The City's official position in this case is that the questions raised by Oldridge in this email were reasonable to ask and deserved to be answered.  (Doc. 70, statement of facts 22.)  Her sin, according to the City's brief, was not going through her chain of command and copying the other Lieutenants, City Manager, the City Attorney and a private lawyer on the email.  (Doc. 70, statement of facts 24.)

15.  The City Manager emailed the City Attorney stating the questions were reasonable and should be answered.  (Ex. 37, p. 34 - 35). Despite that instruction, most of the questions remained unanswered until after Oldridge filed this lawsuit. (Ex. 38, p. 61-62). Pinkston prepared a more detailed set of answers, which were produced during discovery. (Ex. 38, p. 61; Ex. 39). These more detailed answers were not provided to Oldridge, pending the PSB investigation, and by the time it was over Oldridge had begun the process of litigation.  (Ex.38, p. 68) Further, City HR ultimately told the Chief not to use anonymous surveys. (Ex. 34, p. 31-32).

16.  Instead of answering the questions, as the City Manager requested, WPD leadership immediately caused Oldridge to be investigated by PSB for "Conduct Unbecoming an Officer." (City Ex. 24, at COW 03889).  The PSB report states "Deputy Chief Livingston alleged that the totality of the circumstances surrounding the e-mail Lieutenant Oldridge sent constituted conduct that was unbecoming of a Wichita Police Department employee."  *Id. (emphasis added).*

17.  WPD Regulation 3.0 governs "Professional Conduct". It has various specific obligations, and each is graded with a seriousness level of A through F, with F being the most serious. (City Ex. 25)

a. Subsection 3.206 provides that "departing from the truth" in one's official duties is an "F" penalty – the most serious. (City Ex. 25, p.1).

b. Subsection 3.1309, which provides that "the chain of command shall be observed." Violating this subsection is an "A" penalty – the least serious. (City Ex. 25 p. 6).

c. Subsection 3.20, which Oldridge was charged with, provides that conduct which "brings the department into disrepute" or "discredits the officer" or which "impairs the operation or efficiency" of the department is a category D violation.  (City Ex. 25, p 9).

18.  Detective Tammy Doshier was the primary investigator and authored the report on the PSB investigation of Oldridge.  She interviewed 47 witnesses and the report spans 191 pages, single spaced. (City Ex. 20).

19.  When asked "what possible questions would there be of recipients that would tell you whether sending that e-mail went outside the chain of command?", Captain Germany answered, "I don't know."   (Ex. 28, p. 117).

20.  PSB interviewed Wanda Givens, now Deputy Chief.  (City Ex. 20, at COW 00034). Oldridge neither included Givens as a recipient on the email nor referenced Givens within it.

Nicholson testified about that as follows: "Q. As you sit here, can you think of any reason Wanda Givens would need to be interviewed to decide whether Exhibit 3 is conduct unbecoming? A. No." Wanda Givens told the PSB investigators she thought the email was racist. (City Ex. 20, at COW00035).

21. While this investigation was pending, Oldridge could not serve as Acting Captain. This impaired her professional development and cost her extra pay. (Ex. 35, p. 31; Ex. 40).

22. The process of interviewing virtually all of Oldridge's peers in the PSB investigation was damaging to Oldridge's standing in the department. Nicholson signaled that he agreed with this point at his deposition, stating that having your peers interviewed like that "probably wouldn't be helpful" to one's career at the department. (Ex. 29, p. 57)

23. During his PSB interview, Nicholson testified that "it's funny that, uh, she would question my qualifications . . . when she got promoted to Lieutenant, uh, after she'd only been a Sergeant for six months and . . . nobody said anything about that . . . she was forgettin' about her own damn, uh, how they skirted rules for her . . . ." (City Ex. 20, at COW 00032). At deposition, however, he admitted he did not know whether that was true. (Ex. 29, p. 60)

24. Oldridge does not believe any exceptions were made for her when she was promoted from Sergeant to Lieutenant. That process was governed by the Union Collective Bargaining Agreement and whatever rules were applied to her applied to everyone else who applied. The Union contract does not govern the promotion from Lieutenant to Captain. (Ex. 40).

25. During his PSB interview, Nicholson testified that there were "some other Lieutenants that have been promoted, uh, that don't have qualifications . . . . (City Ex. 20, at COW 00032). At his deposition, however, Nicholson said he did not know of any such Lieutenants. (Ex. 29, p. 65); Ex.51, at COW 00815).

26.   During his PSB interview, Nicholson testified he disagreed with his promotion dates Oldridge had in her email.  He said he did meet the one-year period, stating his promotion dates were April 1, 2016, and April 3, 2017, and promotion to Captain was April 24, 2018.   (City Ex. 20, at COW 00033).    At his deposition, however, Nicholson admitted he did not meet the qualification period at the time he applied.  (Ex. 29, p. 47-48).  At no point during his PSB testimony did Nicholson make this admission.  (Ex. 51).

27.   At his PSB interview, Nicholson said he suspected Sarah Oldridge's husband, Lance Oldridge, helped Sarah write the email. (City Ex. 20, at COW 00033). At deposition, Nicholson admitted he had no real basis for that statement and could not identify any writing from Lance Oldridge he relied upon. (Ex. 29, p.63).

28.   At his PSB interview, Nicholson testified he felt Oldridge had failed to follow the chain of command in sending the email and that it "was inappropriate and unprofessional in my opinion." (City Ex. 20, at COW 00033).  At deposition, however, he testified quite differently in that he could not explain how sending the email to all Lieutenants would bring disrepute upon Oldridge or the department:

> Q.   So as a captain who has to coach a lot of folks in the department, can you explain to me how copying the police lieutenants on these questions would bring disrepute on the department, discredit Sarah Oldridge or impair the operations or efficiency of the department?
>
> A.   No.            (Ex 29, p. 72).

In other words, when asked to explain how Oldridge's email could meet the definition of conduct unbecoming under which Oldridge was charged, he could not do so.

29.   The PSB investigation of Oldridge revealed the following:

a. Doshier testified she modeled the investigation after the one previously done on Sergeant X because that case also involved an email critical of the Chief sent outside of the

Chain of Command. (Ex. 41, Doshier Depo., p. 77-78). Yet the PSB investigation of Sergeant X involved the interview of one witness (X himself) and generated a 10-page report (City Ex. 23), whereas the PSB investigation of Oldridge involved the interview of 47 witnesses and a 191-page report.

    b.   The PSB investigator testified that Nicholson's dates "weren't a big, huge concern for me, sir" and signaled that the merits of Oldridge's concern were not important. (Dosier depo., 128).  Consequently:

    i.The final report notes that Captain Germany told PSB that he "discussed the summary points of the Chief's email with Lieutenant Oldridge and he believed that he covered all the pertinent points that the Chief wished to express to her and that she wished to be answered." (City Ex. 20, at COW 00017).  However, when forced at deposition to compare the Chief's email with Oldridge's 8 questions, Germany conceded most of her questions were unanswered. (Ex. 28, p. 79-85).

    ii.The final report notes that Nicholson challenged the promotion dates in Oldridge's May email and defended his qualifications.  (City Ex. 20, COW 00033).  The PSB investigator determined Oldridge had the dates correct, and Nicholson was incorrect, but that fact is not in the final report. (Ex. 41, p. 129-130).  At deposition Nicholson admitted he did not meet the one-year requirement when he applied. (Ex 29, p. 47-48).

    c. Because the investigator did not inquire about whether Oldridge's concerns had a legitimate factual basis, the investigator did not provide witnesses with the circumstances under which Oldridge sent the email before they were asked whether they would have sent an email like the one Oldridge had sent.  (e.g., Ex. 51, at COW 00808-820) Specifically, Doshier did not tell witnesses (1) that HR had told Oldridge to direct her Survey Monkey questions to

the Chief (Ex. 41, p. 91); (2) that the City Manager believed the questions should be answered; (3) that Oldridge's questions had being largely unanswered; or (4) that her concerns about Nicholson not having been a Lieutenant for a year was factually correct.  (Ex. 41, p. 128-130; 137-138; see Nicholson PSB interview, which illustrates this point.  Ex. 51).

    d. If witnesses had been provided the full circumstances behind the email, they may have provided different answers to the PSB investigator.  For example, Wendel Nicholson told the PSB investigator that he thought Oldridge's email was partially the product of racism. (City Ex. 20, at COW 00031).   At his deposition, however, Nicholson was presented with the background facts described above.  He testified he no longer believed that Oldridge's email was based on race.  (Ex. 29, p. 55).  Importantly, he testified:

    Q. At the time of your interview, though, you hadn't reached that conclusion yet [of no racial animus].

    A.  No. And as you pointed out, I still hadn't seen all the background.

(Ex.29, Nicholson Depo., 56-57.)

    e. One possible inference from the above facts is that a genuine investigation intending to get to the truth would have been conducted differently and that instead this investigation was designed to make Oldridge look bad to her peers.

  30.  Nicholson was not listed as a recipient of Oldridge's May email that questioned the promotion process and noted that one person applied for Captain without having one year of experience as a Lieutenant.  (Ex. 29, p. 40-43).  He also is not named within its contents.  It was forwarded to him and, because he was upset, he forwarded it to more than 10 other people, most of whom are not in his chain of command and several of whom are not employees of the WPD. (Ex. 29, Nicholson Depo., 40-43)

31. On December 11, 2018, Nicholson was given "educational training" about having forwarded Oldridge's email outside the department.  The documentation of this training states under the heading "disciplinary actions" that there was "none".  (Ex. 42).   Although Nicholson had forwarded the email to people in the department outside his chain of command, the training document did not mention his failure to follow the chain of command or that it might constitute conduct unbecoming an officer.   (Ex.29).   There was no Professional Standards Bureau investigation opened regarding Nicholson's behavior.  (Ex.41, p. 132).

32. The City has raised the PSB investigation of Sergeant X as an example of how a man was treated similarly to Oldridge for sending an email outside of the chain of command. A review of the Sergeant X investigation file reveals the following:

a.  Sergeant X was charged with conduct unbecoming an officer under subsection 3.204, which is a C category violation. (City Ex. 23, COW 03974).  Oldridge was charged under 3.201, which is a D category violation.

b.  The investigation of Sergeant X involved a single interview – Sergeant X. (City Ex. 23, at COW 03984). The investigation of Oldridge involved 47 witnesses.  (City Ex. 20, COW 00002). This included virtually all of her peer Lieutenants, all of whom were male.

c.  The investigation report on Sergeant X totals 10 pages.  (City Ex. 23, COW 03974 - 03983).  The investigation report on Oldridge totals 191 pages. (City Ex. 20, COW 00001 - 00191).

d. During the events leading up to Sergeant X's investigation, he and Chief Ramsay had a "conversation" and exchanged multiple emails.  (City Ex. 23, COW 04065- 04073). When Oldridge emailed the Chief with questions, he never once emailed her back or talked with her about it.  (Ex. 43, p. 75-77)

e.  Sergeant X was originally "sustained" with a one-day suspension, but that was later reduced to a written reprimand. (Ex.44, p. 39-40)

33.  Counsel for the City confronted Oldridge at deposition with a document purporting to be her application that contained the following certifications: "at least 1 year as a Lieutenant by time of promotion." (Ex. 35, p. 151-152; City Ex. 17). Oldridge said these certifications were different from the ones she recalled from when she applied. (Ex. 35, p. 152-153). Later in the deposition, Oldridge's counsel showed her a copy of the printout of the Neo.gov application she had kept from 2018, which fit her recollection that the certification was "at least 1 year as a Lieutenant."  (Ex.35, pp. 303-310 ).

34.  During the 30(b)(6) deposition of the City, it admitted that the Neogov applications of Oldridge and Nicholson that it had produced in discovery, and about which it questioned Oldridge at her deposition, contained false information that was not actually submitted by either Oldridge or Nicholson. (Ex.34, Pennington Depo., p. 25-30). The City attached this misleading document to its Memorandum as Exhibit 16 without noting that it falsely represents the certification language. (Doc. 70, p. 7, statement of fact 18).

35.  One of the people who testified at the City's 30(b)(6) deposition was Deputy Chief Pinkston. During his PSB interview, Pinkston said that he felt that the email from the Chief to Captain Germany "addressed all of Lieutenant Oldridge's questions from the first email."  (City Ex.20, at COW00028).   A jury could find that Pinkston knew this to be untrue, given that when pressed Captain Germany admitted that the answer – which was authored by Pinkston – answered only 3 of the 8 questions. (Paragraph 29 above) Further, when Pinkston appeared for the 30(b)(6) deposition, he brought with him a more complete set of answers he had prepared in 2018, that had not been provided to Oldridge before. (Ex. 38, p. 61; City Ex. 20, COW 00030).

36.    During his PSB interview, Pinkston told the interviewer that he questioned Oldridge's sincerity in the May 9 email because her questions had been answered: "It felt like . . . if her [Oldridge] questions were sincere and earnest . . . I felt that the information provided would've been adequate for her."  (City Ex. 20, at COW 00028). Given the facts of the previous paragraph, a jury could conclude this testimony was untruthful as well.

37.    Deputy Chief Salcido interpreted Oldridge's emails to express EEO concerns. (City Ex. 20, COW 00050). Capt. Germany thought Oldridge may have copied the legal department on her May email because she was making an EEO complaint. (City Ex. 20, at COW 00022).

38.    Lt. Jason Stephens was interviewed as part of the PSB investigation. (City Ex. 20, COW 00114 – 118).  He said he believed he was being indirectly referred to in the May email, because he had inquired about applying and was told he could not. (City Ex. 20, COW 115-16). He noted that Oldridge copied an attorney on the email and said, "this looks like somebody's building a lawsuit against the City and is either acting on the direct advice of this attorney, who I assume is probably a private practice attorney . . . ." (COW 00117).  He is white.  (Ex 40).

39.    The PSB investigator inquired of Oldridge whether in her email she was intending to raise EEO issues for Jason Stephens.  (City Ex. 20, COW 00149).  Oldridge stated her concerns are that people, likely including her, were being discriminated against and she noted to the PSB investigator that she is the only female Lieutenant. (City Ex. 20, COW 00145-46).

40.    When asked by the PSB investigator whether the email questions may have been embarrassing to the Chief, Oldridge said "What I think is if we're engaging in disparate treatment of employees . . . that could be embarrassing, yes . . ." (*Id,* COW 00154.)

41.    Captain Brian White is the Captain over the Training Bureau (City Ex. 20, COW 00047). When asked if Oldridge's email "fit into his expectations of a subordinate" he stated "I think when,

ah, you believe that there's wrongdoing, then, yeah . . . ."  When asked about the wrongdoing suggested by the email, Captain White said, "it appears she was considering her constitutional rights" and "potentially a civil action."  *Id.*  White said Oldridge's emails merited  bringing her in to talk, but not a PSB investigation. *Id.*

42.   Lt. Espinoza and Lt. Holloran told PSB they thought the emails merited an "inquiry" but not a PSB investigation.  (City Ex. 20, COW 00065).  An "inquiry" is an informal fact gathering process, without any formal charge, by one's immediate supervisor. (Ex. 40)

43.   The PSB investigator relied on Law Enforcement Administrative Investigations, a manual guide by Lou Reiter. The Manual cautions about abuses of the investigative process as a form of retaliation:

> Another source of continuous successful litigation against police agency discipline is the area of employee retaliation for speaking out on perceived misconduct (whistle blowing). This can be specific to the agency when the employee is ***subjected to investigation and/or discipline following the employee's reporting of what s/he perceives is other employee misconduct***.

(City Ex. 21, p 1.7, *emphasis added*).

44.   When the PSB investigator asked Lieutenant Allen whether Oldridge's email warranted a charge of conduct unbecoming, he stated no and that the investigation looked retaliatory: "In my opinion, I don't think so.  I think on this one especially and I think you have to take each case one as a case basis I think, um, because what this does is it makes this whole thing ***look like this is retaliatory*** because somebody is trying to make a complaint and I think that's where you have to kinda draw the line."  (City Ex. 20, COW 00054, *emphasis added*).

45.   Members of WPD leadership were upset that Oldridge had copied a private attorney on the May email.  Oldridge's immediate Captain, Germany, told PSB "[s]he upon herself then brings in different people … civil attorney of some type or civil action of some type about interoffice … question about a process, I've never seen.  I wonder why a person would do that unless they have

a hidden agenda." (City Ex. 20, COW 00021). The PSB report states Captain Givens (now Deputy

Chief) "noticed that one of the recipients of the email was a private attorney.   Captain Givens was

concerned about this and believed that the private attorney should have never been send this from

a work email." (City Ex. 20, COW 00037).

46.  On May 30, 2018, Oldridge filed a charge with the Equal Employment Opportunity

Commission raising gender discrimination and retaliation related to the failure to promote her.

(Exhibit 45)

47.  On June 1, 2018, the EEOC dismissed with notice of rights.  (Exhibit 46)

48.  On March 7, 2019, Oldridge filed a Charge with the Kansas Human Rights Commission

which was dual filed with the EEOC. It raised retaliation claims. A copy is attached as Exhibit 47.

49.  On February 22, 2021, the KHRC issued a right to sue letter. (Exhibit 48)


## PLAINTIFF'S RESPONSE TO DEFENDANT'S STATEMENT OF UNCONROVERTED FACTS

The following paragraphs of Movant's statement of facts are uncontroverted: 1 -

3; 5-12; 14; 20; 23; 27; 35.

4.  Controverted in part.   Uncontroverted that the attached FOP Contract is genuine.

Controverted that it applies to Oldridge.  By its terms, Lieutenants are not  a bargaining unit

member.  (See Def. Ex. 4, pp 1, 22)

13.  Controverted in part.  The first three sentences are uncontroverted.  Controverted that the

questions raised by Oldridge did not implicate bias toward women or discrimination.   She

specifically asked how the anonymous survey would "filter out bias."  Because gender bias and

racial bias are forms of bias, Oldridge's objection included them.

15.  Controverted in part.   Controverted that the process is "objective" as that is a

characterization a jury might disagree with.  All promotions must be approved by the Chief and he does not have to follow any recommendations.  (Ex.43, p. 22-23).  Admitted that the City put forward evidence of the panel as described.  Controverted that the jury must accept this evidence at face value.  A jury could reject it because: (1) a man who failed to meet the minimum term as a Lieutenant, and who misrepresented his term as a Lieutenant when he applied, was promoted without explanation (see plaintiff's fact 12); (2) the Chief met with the panel immediately before the interviews, so he had the opportunity to signal his preferences (Ex 52, COW02610); (3) the chief treated Oldridge differently than a similarly situated man who was accused of conduct unbecoming (see plaintiff's fact 29a); and (4) multiple city employees have been shown to have provided false information in this matter (See plaintiff's facts 12, 25-28; 34; 36).

16. Admitted that the City put forward the described evidence.  Controverted that the jury must accept this evidence at face value.  See response to paragraph 15, above.

17.  Admitted that the City put forward the described evidence.  Controverted that the jury must accept this evidence at face value.  See response to paragraph 15, above.

18. Controverted in part.  The first sentence – that Nicholson did not have one year as a Lieutenant when he applied -- is admitted.  The record cited by the City does not support the statement for the rest of the paragraph.  Specifically, the cited record does not support the statement that "WPD practice for all promotion levels consistently allows someone to apply for a position before their one year in rank is hit, so long as they are at the one-year mark by the time they start the new position."  The cited record does not support the sentence beginning with "Plaintiff herself benefitted from this practice . . . ."  Finally, the City's Exhibit 16, Nicholson's Employment Application, does not reflect the true online application submitted by Nicholson.  The City admitted this at its Rule 30(b)(6) deposition.  See plaintiff's fact paragraph 11.

19.  Controverted in part.  In the testimony attached by the City, Oldridge testified that when Nicholson applied, he failed to meet both the requirement of one year as a Lieutenant and also he may not have met the requirement of two years of supervisory experience.  (Ex.35, p.  179:23 – 179:6.)  Further, although it is true that Nicholson had attended Command School and Oldridge had not, Oldridge would have loved to attend Command School but was never invited. (Ex. 40, Oldridge Declaration).  Finally, the City's Exhibit 17, Oldridge's Employment Application, does not reflect the true online application submitted by Oldridge.  The City admitted this at its Rule 30(b)(6) deposition.  See plaintiff's fact paragraph 11.

21. Controverted in part.  The first and last sentence are uncontroverted.  Controverted that Germany provided "general responses to her bulleted questions."  At deposition, Germany admitted that there was no response at all to 5 of the 8 bulleted questions.  (Ex. 28, p.79-85; see plaintiff's fact paragraphs 6).

22. Controverted in part.  Admitted that the witnesses testified as described but controverted because a jury may reject this testimony as not being credible.  Wanda Givens, for example, forwarded Oldridge's May email to several other people, some of them out of the department.  Her forwarded email to her husband included the comment "and so it begins".  Givens told the PSB investigator that because Oldridge was questioning the qualifications of Nicholson, who is black, she previously told Chief Ramsay that she thought Oldridge's email "looks racial." (City Ex. 20, COW 00035).  Further, the fact that Oldridge was not provided complete answers until filing this lawsuit suggests they Command Staff were not comfortable with the questions.  Finally, multiple city employees have been shown to have provided false information in this matter (See plaintiff's facts 12, 25-28, 34, 36). Thus, a jury could reject the testimony that Givens, Ramsay and the Command Staff were fine with the questions.

24. Controverted in part.  Admitted that the witnesses testified as described but controverted because a jury may reject this testimony as not being credible.  The city has not explained how or why openly asking questions that it now admits were reasonable would "create discord and disruption."  Further, multiple city employees have been shown to have provided false information in this matter (See plaintiff's facts 12, 25-28, 34, 36).  Thus, a jury could reject the testimony that Command Staff's real problem with Oldridge's email was that it was copied to all Lieutenant, and had nothing to do with its substance.

25. Controverted.  The email specifically asked how the anonymous survey would "filter out bias" and gender bias is a form of bias.

26. Controverted.  The cited record does not support this statement.

28. Controverted that the "guiding authority" suggested to take a poll of officers to evaluate conduct.  Controverted that officers who were asked during the PSB investigation whether they would send such an email were provided sufficient context to meaningfully answer the question.  See plaintiff's fact paragraphs (Ex. 41, Doshier depo., 128-130; 137-138. The Nicholson PSB interview illustrates this point.  Ex 51).

29. Controverted that the Starbucks meeting qualified as any sort of discipline or education, as there was no documentation of it by Germany. (Ex. 35, p. 288-89, 296-97).  Further, Chief Ramsay claims to have an "open door" policy.  (Ex. 43, pp. 29-30)

30. Controverted in part.  Admitted that both Nicholson and Givens initially believed the email may have a racial basis.  Controverted that this view has any reasonable basis in reality.  At his deposition, Nicholson recanted that view after being shown the background that led Oldridge to send her May email.  (See Plaintiff's Fact paragraphs 29).  Controverted that Nicholson and Givens received "verbal reprimands."  They received "Coaching and Mentoring" that was

categorized as "educational training" the documentation of which stated there was no discipline. (Ex 42, at COW 03943); (Ex 49, at COW 03942).

31. Uncontroverted but supplemented.  As a layperson Oldridge does not know what is or is not "protected" opposition.  Oldridge told the PSB investigator she did not consider the May email as a "formal" EEO complaint, but she was complaining about discrimination and that she felt the PSB investigation would not have happened if she were a man.  (City Ex. 20, COW 00144-45, 156).  Further, see plaintiff's fact paragraphs 37-41 for additional facts pertinent to protected opposition.

32. Controverted in part.  The City's 30(b)(6) witness on this subject testified that it appeared that the male SWAT team member's discipline was reduced to a written reprimand.  (Ex 44, Mumma depo., 31-32).

33. Uncontroverted that the Second Amended Complaint includes a number of specific examples of retaliation.  Controverted that "myriad" is a fair description.

34. Controverted.  The first sentence references Oldridge testimony but no citation to her deposition is provided.  Further, the quoted language from Regulation 3.409E is not accurate – it includes the phrase "a focus or" which is not in the Regulation (City Ex. 25).

<u>ARGUMENT</u>

### I.  Legal standards for summary judgment.

Credibility determinations are for the jury. "Clearly, if the credibility of the movant's witnesses is challenged by the opposing party and specific bases for possible impeachment are shown, summary judgment should be denied . . . ."  Wright & Miller, 10A Fed. Prac. & Proc. Civ. § 2726 (3d ed.); see also *State Farm Mut. Auto. Ins. Co. v. Farm Bureau Mut. Ins. Co*., No. 08-1375-WEB, 2010 WL 2544940, at *10 (D. Kan. June 18, 2010) (denying summary judgment

because the court cannot make credibility determinations about the witnesses). The Court therefore must disregard all evidence favorable to the moving party that the jury is not required to believe. *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 151 (2000). That is, the Court should give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from *disinterested* witnesses." *Reeves*, 530 U.S. 133, 151 (emphasis added).

## II. Legal standards for the consideration of summary judgment motions directed at employee civil rights claims.

A plaintiff may prove discrimination by establishing that the employer's stated reason for its actions is unworthy of belief. Inferring the defendant's unlawful motive from the fact that its explanation is unpersuasive "is consistent with the general principle of evidence law that the factfinder is entitled to consider a party's dishonesty about a material fact as 'affirmative evidence of guilt.'" *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 147 (2000) (quoting *Wright v. West*, 505 U.S. 277, 296 (1992); see also *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981).

The plaintiff can make this showing using direct or circumstantial evidence. *U.S. Post. Serv. Bd. of Governors v. Aikens*, 460 U.S. 711 n.3 (1983). Circumstantial evidence is often "more certain, satisfying and persuasive than direct evidence." *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 100 (2003) (quoting *Rogers v. Missouri Pacific R. Co.*, 352 U.S. 500, 508, n.17 (1957)).

It is an abuse of discretion for a Court to refuse to consider other employees' circumstances, in addition to the plaintiff's, just because the employees have different supervisors. *See Spirit/United Management Co. v. Mendelsohn*, 552 U.S. 379, 387 (2008). Thus, with respect to the relevance of "comparators," employees are similarly situated when they share a supervisor *or decision-maker*, must follow the same standards, and engage in comparable conduct. *Ibrahim v.*

*All. for Sustainable Energy, LLC*, 994 F.3d 1193, 1196 (10th Cir. 2021); *Smothers v. Solvay Chemicals, Inc*., 740 F.3d 530, 540 (10th Cir. 2014) (citations omitted).  The Chief is the final decision-maker.

### III.    Oldridge Has Established Prima Facie Case

The City argues that Oldridge has insufficient evidence to show even a prima facie case.  Doc 70, p. 13.  Oddly, the City's brief takes that position without ever stating the standard by which a prima facie case is judged.   The prima facie requirement had its beginning under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).  That case involved a termination and the Supreme Court set out the four elements of a prima facie case as: (1) plaintiffs belong to a protected group; (2) they were qualified for their jobs; (3) they were terminated despite their qualifications; and (4) after their termination the employer hired someone or sought applicants for plaintiffs' vacated positions whose qualifications were no better than those of plaintiffs. 870 F.Supp. at 323.

The Tenth Circuit has noted that these elements are quite flexible and must be tailored to the type of case.  In reversing a district judge's summary judgment, the Tenth Circuit explained: "We agree that the district court erred in applying the *McDonnell Douglas* framework without modification to suit the circumstances of this particular controversy." *Tomsic v. State Farm Mut. Auto. Ins. Co.,* 85 F.3d 1472, 1476 (10th Cir. 1996).

Here, the elements of Oldridge's prima facie claim for gender discrimination in the failure to promote is quite simple: (1) she is a female; (2) she was qualified for the promotion; (3) she was not promoted despite her qualification; and (4) a man was promoted instead of her.  That is all that is required to state the prima facie case on that claim. Furthermore, there can be no question plaintiff has stated a prima facie claim when we add in this fact: the man who was promoted did

not meet the published one-year experience as a Lieutenant when he applied and nonetheless falsely certified that he did meet it.

Regarding Oldridge's retaliation claims, here too she has shown a prima facie case.  Oldridge has come forward with evidence that (1) she is a female; (2) she opposed practices that may lead to illegal discrimination (Survey Monkey; promoting a man who did not meet the published qualifications); (3) she was immediately subjected to an unprecedented investigation consisting of the sworn interview of 47 witnesses and the preparation of a 191 page report, ostensibly for having copied the email out of her chain of command; and (4) a man who was investigated for sending an email critical of the Chief outside of his chain of command was investigated without subjecting his peers to sworn interviews about it and with the preparation of a modest 10 page report.   This easily meets the relatively low bar of a prima facie case in a retaliation case.  Add in the evidence that the WPD has been less that forthright (false documents produced; misleading testimony) and the prima facia case is well established.

### IV.   Oldridge Has Ample Evidence of Pretext

The City argues "[t]here is nothing in the record before this Court to establish 'pretextual' reasons for the employment decisions of the City."  Doc. 70, p. 17. The City argues that plaintiff cannot prove gender discrimination because she cannot show sexual or gender comments from any of the decision makers, citing *Flitton v. Primary Residential Mortg., Inc.,* 238 Fed. Appx. 410 (10th Cir. 2007). But *Flitton* did not hold that a plaintiff in a gender discrimination case *must* have such direct evidence that gender was in play.

 Inferring the defendant's unlawful motive from the fact that its explanation is unpersuasive "is consistent with the general principle of evidence law that the factfinder is entitled to consider a party's dishonesty about a material fact as 'affirmative evidence of guilt.'" *Reeves v. Sanderson*

*Plumbing Prods.*, 530 U.S. 133, 147 (2000) (quoting *Wright v. West*, 505 U.S. 277, 296 (1992)). The Tenth Circuit has put it this way: "[a] jury may infer discriminatory animus from "the simple showing of pretext," and it may find illegal discrimination upon a prima facie case and pretext." *Tomsic v. State Farm Mut. Auto. Ins. Co.*, 85 F.3d 1472, 1476 (10th Cir. 1996).

Oldridge may prove pretext by producing evidence of "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted nondiscriminatory reasons." *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997) (quoting *Olson v. Gen. Elec. Astrospace*, 101 F.3d 947, 951-52 (3d Cir. 1996)).

The pretext evidence here is quite strong. The City's defense in this case is that it promoted the most qualified applicants for the position of Captain. Yet one of the men promoted, Wendel Nicholson, did not meet one of the published requirements – one year as a Lieutenant. Those submitting an application for Captain on Neo.gov were required to make a present tense statement about whether he had one year of experience as a Lieutenant. Nicholson stated he did, even though he did not. Nicholson did not talk with any of his superiors to see whether this requirement could be waived, he simply made the false representation as part of the application.  WPD policy makes false statements related to one's work a maximum "F" penalty. Despite this, Nicholson was promoted and Oldridge was not. This flatly contradicts the City's position that it simply followed an objective procedure and promoted the most qualified applicant. Finally, even though Nicholson forwarded Oldridge's email outside his chain of command and outside the City, he was merely coached and was not disciplined.

A jury may reasonably infer gender played a role in the promotion because of the differences between how Oldridge has been treated since the promotion of Nicholson. In particular, a comparison of her treatment since the promotion decision with that of how the department another man – Sergeant X – is instructive.

Sergeant X was a member of the SWAT Team. He had a dispute with the Chief and at one point sent an email to the Chief and copied all of the SWAT Team members.  There are a number of Sheriff Department members on the SWAT Team, so Sergeant X's email went outside of the WPD. Sergeant X was reported to PSB and investigated. The City argues this is proof that Oldridge was treated just like a man would be under similar circumstances.  Sergeant X's PSB investigation, however, was very different from Oldridge's. First, the only person interviewed was Sergeant X himself. Second, the PSB report was 10 pages long. Third, although originally sustained and given a one-day suspension, ultimately Sergeant X's discipline was reduced to a written reprimand. This is quite different from the investigation of Oldridge, which involved the interview of 47 witnesses, including most of Oldridge's peers and superiors at the department, a 191-page report and a one-day suspension which was served.

Finally, Oldridge has evidence that WPD leadership was upset that Oldridge had contacted a lawyer about the issues raised in her May email.  Both Germany and Givens told PSB that they were bothered by Oldridge copying a private lawyer.  An attorney letter to the company raising complaints of bias or reprisal can be protected activity.  *O'Neal v. Ferguson Const. Co.*, 237 F.3d 1248, 1255 (10th Cir. 2001) (letter disclosing employee's dissatisfaction with new position and attributing the placement to retaliation over an EEOC charge).  Likewise, informal complaints to supervisors constitute protected activity.  *O'Neal,* 237 F.3d 1248, 1255 (citations omitted).  In this vein, an employee's notification to her employer that she has retained an attorney due to

discrimination is a protected activity. *Nguyen v. Gambro BCT, Inc.*, 242 F. App'x 483, 491, 2007 WL 1765518 (10th Cir. 2007).

### V.    Oldridge Suffered Consequences Sufficient to State a Claim of Retaliation

The City argues that the events identified in Oldridge's "Amended Complaint are not evidence of discrimination because there is no adverse employment action."  Doc. 70, p. 21.  As support for this position, the City states "An adverse action can only occur when it 'alters the employee's compensation, terms, conditions, or privileges of employment, or adversely affects his ... status as an employee.' *Alabi v. Vilsack*, No. 20-2081, 2021 WL 2523909 (10th Cir. June 21, 2021) citing *Heno v. Sprint/United Mgmt. Co.,* 208 F.3d 847, 857 (10th Cir. 2000)."  Contrary to the City's brief, *Alabi* nowhere references *Heno* and does not contain the quoted language.

On the contrary, *Alabi* applied a different – more lenient – standard:  To constitute materially adverse employment action, "an action must be sufficient to 'dissuade a reasonable worker from making or supporting a charge of discrimination." *Daniels v. United Parcel Serv., Inc.*, 701 F.3d 620, 638 (10th Cir. 2012) (quoting *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 57, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006)). *Alabi*, 860 Fed. Appx. 576, 581-81.

Not only is the law applied by the Tenth Circuit in *Albi* different from what the City states, but the case is also factually distinguishable.  In *Albi*, the plaintiff was claiming that he was retaliated against by the issuance of a Letter of Warning.  2021 WL 2523909 at *1.  In finding the letter insufficient to qualify as retaliation, the Court emphasized the letter "confidential" and was "not disciplinary".  *Id.,* at *5.  That is nothing like the present case.  Far from being confidential, the PSB investigation involved the interview of 47 people, including virtually all of Oldridge's peers.  Further, Oldridge suffered actual discipline – including a suspension from her job.

The *Heno* case cited by the City does in fact contain the standard quoted by the City.  But *Heno* is no longer good law.  After *Heno* was decided by the Tenth Circuit in 2000, the U.S. Supreme Court resolved a split among the circuits and adopted a more lenient standard for adverse employment action in a retaliation case. *Burlington N. & Santa Fe Ry. v. White,* 548 U.S. 53, 57 (2006).  *Albi* quoted *Burlington.*  2021 WL 2523909 at *4.

Examples provided by the Supreme Court in *Burlington Northern* are instructive.  For example, the Supreme Court said: "A supervisor's refusal to invite an employee to lunch is normally trivial, a nonactionable petty slight. But to retaliate by excluding an employee from a weekly training lunch that contributes significantly to the employee's professional advancement might well deter a reasonable employee from complaining about discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 69 (2006).  Applied here, there can be no question that having virtually all of one's peers and the leadership team interviewed as part of a PSB investigation, where they are not provided the full context of one's actions, significantly undermined Oldridge's future at the WPD.  This is more than adequate to qualify as an adverse action sufficient to support a claim of retaliation.

## VI.   Oldridge Engaged in Protected Activity.

The City argues that Oldridge's emails were not a protected activity that could trigger protection from a retaliation claim. (Doc. 70, pp. 26-28).  The City relies on *Kawahara v. Guar. Bank & Tr.,* 835 F. App'x 386 (10th Cir. 2020).  In that case an Asian American female employee complained that certain actions by her employer were "not right" and later was terminated.  The Tenth Circuit held that she had not alleged that any of the actions were illegal, and therefore had not engaged in a protected activity.  The present case is distinguishable because unlike the

employer *Kawahara,* here recipients of Oldridge's email interpreted it to be a complaint of illegal discrimination, including at least two-one members of command staff.

Lieutenant Jason Stephens was interviewed as part of the PSB investigation.  (Ex. 20, COW 00114 – 118).  He said he believed he was being indirectly referred to in the May email, because he had inquired about applying and was told he could not.  (COW 115-16).  He noted that Oldridge copied an attorney on the email and said "this looks like somebody's building a lawsuit against the City and is either acting on the direct advice of this attorney, who I assume is probably a private practice attorney . . . ." (COW 00117).  Similarly, The PSB investigator inquired of Oldridge whether she was intending to raise EEO issues for Jason Stephens.  (Ex. 20,  COW 0000149).

Captain Brian White, who is the Captain over the Training Bureau, viewed Oldridge's email as reporting "wrong doing" that may implicate "her constitutional rights" and "potentially a civil action."  Lieutenant Allen noted that Oldridge was "trying to make a complaint" and the PSB investigation made "this whole thing look like this is retaliatory."  All involved knew Oldridge was the only female Lieutenant out of approximately 30 Lieutenants and was complaining about the promotion of a man.  Oldridge mentioned that fact when asked by the PSB investigator whether her complaint included gender discrimination.

Most importantly, Deputy Chief Jose Salcido noted that he had served as the Deputy Chief over Support Services, and therefore was familiar with EEO complaints and policy for how to make them.  (Ex. COW 00050).  He said it is clear to him that Oldridge was making an EEO complaint but that "in this instance when this email went out either she [Oldridge] ignored policy or she didn't know policy." *Id.* Deputy Chief Pinkston interpreted Oldridge's March email to imply she thought the process was rigged – that "the fix was in."

These facts are sufficient to raise a jury question about whether Oldridge was engaging in a protected activity.  See, e.g., *Treat v. Conoco Philips Co.*, 2007 WL 464707, at *2 (W.D. Okla. Feb. 8, 2007) (concluding that jury could find employer's concerns about termination appearing discriminatory cast doubt on the validity of the concerns about the employee's performance); *Golden v. Cretex Companies, Inc*., 337 F.Supp.2d 1164, 1169 (D.Minn. 2004) ("circumstantial evidence that defendant was conscious of its liability with respect to age discrimination" relevant in determining whether Company acted with discriminatory intent); *Spagnoli v. Brown & Brown Metro, Inc.,* 2007 WL 2362602, at *14 (D.N.J.,2007) (finding relevant defendant's email stressing need to avoid appearance that job elimination decision was discriminatory).

Oldridge's complaints about how the other man was treated are also protected.  The "opposition" clause protects conduct by an employee who is not the direct victim of a practice made unlawful under Title VII, but who "opposes" such discrimination against others. *Littlejohn v. City of New York* , 795 F3d 297, 318 (2nd Cir. 2015); *Eichman v. Indiana State Univ. Board of Trustees*, 597 F2d 1104, 1106-1107(7th Cir. 1979) — male worker allegedly fired for helping female coworker assert Title VII sex discrimination claim.

Oldridge must prove traditional but-for causation with respect to her retaliation claim. *Gross v. FBL Financial Services, Inc*., 557 U.S. 167, 176 (2009). That form of causation is established whenever a particular outcome would not have happened "but for" the purported cause. *Id.* Oldridge need not disprove that concerns about following the chain of command were genuine. All she must prove is that absent the retaliatory motive, she would not have been treated the way she in fact was treated.  Oldridge is not required to prove that the retaliatory motive was the ***only*** cause of how she was treated, *McDonald v. Santa Fe Trail Transp. Co*., 427 U.S. 273 (1976) ("but for" cause does not mean sole cause), just that it was one of the causes that made a difference.

Finally, defendant seeks to pick off many of the slights that Oldridge complains about as being retaliation one at a time, rather than address them collectively.  This approach is improper.  *Vance v. Southern Bell T&T Co*., 863 F.2d 1503 (11th Cir. 1989), cautions against the Balkanization strategy, breaking a hostile environment into discrete bits to pick them off one at a time. The law requires instead that the court consider the "totality of the circumstances." The cause of action may consist of many or few statements and acts, which, taken together, constitute the discriminatory offense. In assessing the credibility and weight of the evidence, the jury will not "examine each alleged incident of harassment in a vacuum." The discrimination suit is "a single cause of action rather than a sum total of a number of mutually distinct causes of action to be judged each on its own merits." Id.  Similar reasoning applies to retaliatory conduct.

<u>CONCLUSION</u>

For the reasons stated above, defendant's motion should be denied.

Dated: November 17, 2021.

SUBMITTED BY:

GRAYBILL & HAZLEWOOD, LLC

/s/ Donald N. Peterson, II
Donald N. Peterson, II, #13805
Sean M. McGivern, #22932
218 N. Mosley St.
Wichita, KS 67202
Telephone: (316) 266-4058
Fax: (316) 462-5566
don@graybillhazlewood.com
sean@graybillhazlewood.com
***Attorneys for Plaintiff***

## CERTIFICATE OF SERVICE

I hereby certify that on November 17, 2021 the above and forgoing was electronically filed with the Clerk using the CM/ECF system, which will send notice of electronic filing to the following:

Jennifer M. Hill, #21213
jhill@mcdonaldtinker.com
Edward L. Keeley, #09771
ekeeley@mcdonaldtinker.com
MCDONALD TINKER PA
300 W. Douglas, Ste. 500
Wichita, KS 67202
Phone: (316) 263-5851
Fax: (316) 263-4677
***Attorneys for Defendant***

/s/ Donald N. Peterson, II
Donald N. Peterson, II, #13805
Sean M. McGivern, #22932